UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WENDI R. MORSE and FELICIA KAY PENNINGTON individually and on behalf of others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CAUSE NO: 1:08-cv-1389 WTL-JMS ) |
| MER CORPORATION d/b/a DANCERS SHOWCLUB, | ) ) ) |
| Defendant. | ) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

### I.    INTRODUCTION

This is not a complicated case, nor is it a novel one.  Plaintiffs Wendi R. Morse and Felicia Kay Pennington (together, "Plaintiffs") and the class of women they represent were employed by MER Corporation as Entertainers and worked at Dancers Showclub in Indianapolis ("Defendant").  During the course of their employment, each and every Entertainer was provided with, and subject to, a host of rules entitled "Entertainer Guidelines" ("Guidelines").  The Guidelines reference Entertainers being hired.  The Guidelines set forth prices that must be charged and place an array of restrictions upon the Entertainers.  The Guidelines note that Entertainers can face termination if certain Guidelines are violated.  In addition to controlling the Entertainers, Defendant controlled every aspect of its operations, from advertising to security to staffing to music and lighting.  These facts are not disputed, yet Defendant claims the undisputed evidence demonstrates that the Entertainers were independent contractors who exercised

1

complete control over the terms and conditions of their employment.  Then again, Defendant also claims that topless dancers are not an integral part of a topless nightclub.

Plaintiffs have moved this Court for summary judgment on the basis that Defendant misclassified them as independent contractors and, as a result, violated their rights under the Fair Labor Standards Act ("FLSA").  Other Federal Courts that have examined this issue in cases involving similar facts have found just that.  Based on the undisputed facts and prevailing law, Plaintiffs respectfully reiterate their summary judgment request.

## II.     STATEMENT OF MATERIAL FACTS IN DISPUTE [FN1]

"The Defendant did not monitor or regulate how much an Entertainer could charge for a private dance, so that they were free to charge more than the suggested $20.  (Morse Dep. 47:10-12.)"  Defendant's Brief, pg. 4.

**Disputed:**     Plaintiffs do not dispute that they are not prohibited from charging more than $20.00 for a private dance, however, Entertainers are required to charge a minimum of $20.00 per private dance.  [James Bradley Nicholson Dep., pg. 59, ln. 16 – pg. 60, ln. 1; Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3] [FN2]  Entertainers who fail to charge $20.00 for private dances are potentially subject to discipline.  [James Bradley Nicholson Dep., pg. 66, ln. 23 – pg. 67, ln. 4]  These facts are not disputed by Defendant.  See Plaintiffs' Brief, pg. 3 and Defendant's Brief, pg. 9, fn. 1.

---

[FN1] Although Plaintiffs are disputing certain facts deemed material by Defendant in its Statement of Undisputed Material Facts, neither these facts nor the dispute surrounding them should preclude Plaintiffs from obtaining summary judgment in their favor because the undisputed material facts set forth in Plaintiffs' Brief in Support of Motion for Summary Judgment (Docket Entry No. 57, pgs. 2-6) still warrant such a result.

[FN2] All of the evidence to which Plaintiffs cite in this Brief has been filed with the Court as part of Plaintiffs' Designation of Evidence in Support of Plaintiffs Motion for Summary Judgment (Docket Entry No. 58) with the exception of a citation to an excerpt from the Deposition of Angela Avalos that was filed with the Court as part of Defendant's Designation of Evidence in Support of Defendant's Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment (Docket Entry No. 65-5) and a citation to the Affidavit of Stephen D. Nicholson that was filed with the Court as part of Defendant's Designation of Evidence in Support of Defendant's Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment (Docket Entry No. 65-6).

"The Defendant did not prohibit Entertainers from chewing gum or walking in the club with lit cigarettes. (James Nicholson Dep. 63:8-10.) These activities are 'strongly discouraged' by the Defendant, but were not forbidden. (*Id.* at 63:12-16.)" Defendant's Brief, pg. 5.

**Disputed:** Defendant's Guidelines unambiguously state that chewing gum and walking in the club with lit cigarettes is not allowed. [Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]

"Income from Entertainers amounted to no more than 10% of the Defendant's gross income in any given month. (*Id.* at ¶¶ 6-7.)" Defendant's Brief, pg. 6.

**Disputed:** Mr. Nicholson's Affidavit states that over 50% of Defendant's profits are derived from alcohol sales, approximately 20% of Defendant's profits are derived from "cover charges," "House Fees" account for an average of 5% of Defendant's profits, and approximately 6% of Defendant's profits come from "Goodfellas" room charges. [Stephen D. Nicholson Aff., ¶¶4-7] Thus, the Affidavit testimony cited by Defendant does not establish that Entertainers are only responsible for "no more than 10%" of Defendant's income. In fact, Mr. Nicholson's deposition testimony that customers rarely visit Defendant's club for the exclusive purpose of obtaining food and drink demonstrates the inaccuracy of this "fact" as it is the presence of Entertainers that attracts customers, thereby allowing Defendant to assess "cover charges" and sell alcohol. [James Bradley Nicholson Dep., pg. 27, lns. 16-20]

### III.  LEGAL STANDARD

Plaintiffs have previously set forth the governing standard in their Brief in Support of Motion for Summary Judgment (Docket Entry No. 57, pgs. 6-7).

## IV.  ARGUMENT

Defendant concedes that this case should be analyzed using the six-factor "economic reality" test set forth in Secretary of Labor, U.S. Dept. of Labor v. Lauritzen, 835 F.2d 1529, 1534-1535 (7th Cir. 1987).  However, Defendant's application of the "economic reality" test to the undisputed facts of this case is fundamentally flawed.

> i. The nature and degree of Defendant's control as to the manner in which the work is to be performed.

Defendant claims that it did not control the manner in which Entertainers performed their work.  In an effort to cobble together an argument, Defendant focuses on the freedoms it granted to Entertainers and attempts to minimize, or just flat-out ignores, fact after fact after fact documenting Defendant's control over Entertainers.  The most likely explanation for this strategy is that other Federal Courts examining similar facts in the context of adult entertainment establishments have found in favor of the plaintiffs on this issue.

For example, the Fifth Circuit Court of Appeals upheld the District Court's ruling in favor of the Department of Labor (plaintiffs) on the same issue presented to this Court – whether topless dancers at nightclubs were employees or independent contractors.  The Court ruled:

> The district court found that Circle C exercises a great deal of control over the dancers.  The dancers are required to comply with weekly work schedules, which Circle C compiles with input from the dancers as to the days that they wish to work.  Circle C fines the dancers for absences and tardiness.  Circle C instructs the dancers to charge at least $10 for table dances and $20 for couch dances.  The dancers supply their own costumes, but the costumes must meet standards set by Circle C to promote the desired atmosphere.  The dancers can express a preference for a certain type of music, but they do not have the final say in the matter. Several dancers testified that they were expected to mingle with customers when not dancing.  Circle C has promulgated many other rules concerning the dancers' behavior; for example, no flat heels, no more than 15 minutes at one time in the dressing room, only one dancer in the restroom at a time, and all dancers must be

> "on the floor" at opening time.  Circle C enforces these rules by fining infringers.
>
> The defendants attempt to de-emphasize Circle C's control by arguing that most of the rules are directed at maintaining decorum or keeping the nightclub legal.  The defendants explain that Circle C publishes the minimum charge for table and couch dances at the request of the dancers to prevent dancers from undercutting each others' prices.  Finally, the defendants stress the fact that Circle C does not control the dancers' dance routines.
>
> Despite the defendants' effort on appeal to downplay Circle C's control, the record fully supports the district court's finding of significant control.

Reich v. Circle C. Investments, Inc., 998 F.2d 324, 327 (5th Cir. 1993).

The only major different between the instant case and Circle C is that Defendant did not require Entertainers to comply with a weekly work schedule *per se*.  However, Defendant did require Entertainers to work a minimum of six (6) hours per shift unless it decided to approve an Entertainers' request that she be allowed to deviate from the rule. [James Bradley Nicholson Dep., pg. 61, lns. 11-24; Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3; Defendant's Answer to Plaintiffs' Interrogatory No. 14, pg. 6]  Similar to Circle C, Entertainers are subject to discipline if they do not receive permission to leave their shifts before meeting the six-hour requirement. [James Bradley Nicholson Dep., pg. 61, ln. 21 – pg. 62, ln. 13]  Such a factual difference hardly compels this Court to reach an opposite result, especially in light of all the factual similarities.

Similar to Circle C, Entertainers are required to charge a minimum of $20.00 per VIP dance and, once again, Entertainers who fail to charge the minimum rate are potentially subject to discipline. [James Bradley Nicholson Dep., pg. 59, ln. 16 – pg. 60, ln. 1, pg. 66, ln. 23 – pg. 67, ln. 4; Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]  Another similarity between this case and Circle C is that the dancers provide their own clothing

5

but, in both cases, the club has implemented certain standards regarding what clothing is permissible.  [James Bradley Nicholson Dep., pg.76, lns. 1-10; Stephen D. Nicholson Dep., pg. 46, ln. 22 – pg. 48, ln. 20]  The music policy in <u>Circle C</u> mirrors the one in the instant case were Entertainers can make requests to the DJ about what music to play, however, the music selection is controlled exclusively by the DJ and the managers.  [Stephen D. Nicholson Dep., pg. 45, ln. 20 – pg. 46, ln. 14]  Finally, like <u>Circle C</u>, Entertainers were subject to a host of other rules governing their behavior, such as not being allowed to have cell phones on the floor, chew gum, walk with lit cigarettes, or drink from bottles.  [Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]

     The Fifth Circuit's decision in <u>Circle C</u> is hardly an outlier.  To the contrary, other Federal Courts reviewing similar operations have reached the same conclusion.  In <u>Harrell v. Diamond A Entertainment, Inc.</u>, 992 F.Supp. 1343 (M.D.Fla. 1997), the District Court noted:

> The mere fact that Diamond A has delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the status of independent contractors.  Indeed, one could say that the nature of a dancer's job requires some measure of discretion and flexibility.  The question this Court must resolve is whether a Diamond A dancer's freedom to work when she wants and for whomever she wants reflects economic independence, or whether these freedoms merely mask the economic reality of dependence.
>
> . . .
>
> In the present case, several facts suggest that Diamond A exercised considerable control over its dancers.  The club established a set fee for table dances, and the disc jockey announced this fee on a regular basis.  Each dancer was obligated to perform on center stage during her "stage rotation."  Dancers could not wear flats.  And the club employed "bouncers" to protect the dancers in case a customer "got out of hand."  It is also apparent that the dancers had no control over the customer volume or the atmosphere at each of the nightclubs.  At the same time, all dancers were required to abide by written rules and regulations which were incorporated by

> reference in the license agreement. These included: (i) fines for unexcused absences, tardiness, and intoxication; (ii) a rule requiring the dancer to leave the club as soon as her shift was over and to not frequent the club as a patron or as a guest of a customer; (iii) a rule requiring the dancer to perform "for all patrons of the club, not one or two"; (iv) a rule requiring the dancer to inform the disc jockey of her musical preferences in advance and to not complain about the music once her performance began; and (v) a rule requiring the dancer to not permit any customer to touch her "private parts," and to act courteously and "professional" to all customers.
>
> These facts overshadow the smaller freedoms that Diamond A allowed its dancers. On the record before it, the Court cannot say that Plaintiff exerted such control over a "meaningful part" of the business that she stood "as a separate economic entity" from Diamond A. This factor therefore cuts in favor of economic dependence.

Id at 1349-50 (internal citations omitted).

In Reich v. Priba Corp., 890 F.Supp. 586, 592 (N.D.Tex. 1995), the District Court came to a similar conclusion:

> Defendants exercise control over the entertainers. Cabaret Royale has set show times during which an entertainer may perform. The club also has guidelines describing the way in which an entertainer is to conduct herself while at the club. At the end of an evening, the club deducts twenty percent from each entertainer's credit card tips to cover credit card administrative costs. Additionally, a woman who desires to dance at the Cabaret Royale must sign an independent contractor agreement that is prepared by the club, without any input from the would-be independent contractor.
>
> . . .
>
> While all of these factors suggest control, the real touchstone is the reality of the employment relationship. An entertainer at Cabaret Royale is completely dependent on the club for her earnings. The club controls all of the advertising, without which the entertainers could not survive. Moreover, the defendants created and control the atmosphere and surroundings at the Cabaret Royale, the existence of which dictates the flow of customers into the club. An entertainer can be considered an independent contractor only if she 'exerts such a control over a meaningful part of the business that

7

> she stands as a separate economic entity.' In this case, the entertainer's economic status is inextricably linked to those conditions over which defendants have complete control.

Id at 592 (internal citations omitted).

Defendant would lead this Court to believe that Entertainers had unfettered freedom in almost every aspect of the work environment. Unfortunately for Defendant, the undisputed facts demonstrate otherwise, as do the findings of other Federal Courts that have analyzed similar enterprises. This first prong of the "economic reality" test weighs in favor of Plaintiffs' claim that they should be classified as employees, not independent contractors.

    ii.    Plaintiffs' opportunity for profit or loss depending upon their managerial skill.

Ignoring the undisputed facts and dismissing a host of on-point decisions by claiming that all of those Federal Courts misunderstood the law, Defendant contends that the opportunity for profit and loss lies exclusively with Entertainers because "a particular Entertainer's earning power was not within the control of the Defendant. Instead, the Entertainers controlled their own opportunities for profit, and those opportunities were numerous." Defendant's Brief, pg. 17. Defendant's argument is substantially flawed.

The undisputed evidence in this case demonstrates that Defendant is responsible for the managerial decisions that effect Entertainers' opportunity for profit and loss. Under Defendant's business structure, Entertainers earn income from customers and Defendant admits that it is responsible for virtually every facet of the business that drives traffic into Defendant. Defendant, not Entertainers, make all of the capital investments in the facilities, provides all of the advertising, maintains the facility, provides security for the facility, staffs the facility, controls the sound system and lights, provides the food, supplies the beverages, and maintains other inventory. [Defendant's Answer and Affirmative Defenses, Docket Entry No. 14, ¶21;

Defendant's Answer to Plaintiffs' Interrogatory No. 9, pgs. 3-4]  The Fifth Circuit found such facts to be dispositive on this issue.  See Circle C, 998 F.2d at 328.

Defendant claims that Entertainers had the unfettered ability to lure customers via social networking sites, pricing, and developing relationships with customers.  Again, Defendant's argument ignores the undisputed evidence which demonstrates that Defendant severely limited these opportunities.  For example, Entertainers are not free to set their own prices.  Defendant required Entertainers to charge a minimum of $20.00 per VIP dance.  [James Bradley Nicholson Dep., pg. 59, ln. 16 – pg. 60, ln. 1; Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]  When using the "Goodfellas" room, also known as the "champagne room," Defendant controlled both the pricing ($325.00 per hour) and the distribution ($250.00 to the Entertainer, $75.00 to Defendant) of the transaction.  [James Bradley Nicholson Dep., pg. 60, lns. 10-25; Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]  As such, Entertainers were prohibited by Defendant from negotiating lower prices for VIP dances and different prices for use of the "Goodfellas" room, prohibitions that limit the Entertainer's opportunity to earn additional money and market herself to more customers.

Along the same lines, Defendant places numerous limitations on Entertainers' abilities to meet and/or interact with paying customers.  Entertainers are prohibited from patronizing Defendant's club on nights when they are not working unless they receive permission to do so from a manager  [James Bradley Nicholson Dep., pg. 63, ln. 25 – pg. 64, ln. 6; Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]; Entertainers are not permitted to have their friends, family members, and significant others visit and/or patronize them while they are working at Defendant's club  [Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]; Stephen D. Nicholson, one of Defendant's managers,

9

informed Entertainers that they were not permitted to dance at other night clubs [Wendi Morse Dep., pg. 76, lns. 9-21; Stephen D. Nicholson Dep., pg 5, lns. 6-11]; and Entertainers are not allowed to have cell phones on the floor. [Stephen D. Nicholson Dep., Exhibit 5; James Bradley Nicholson Dep., Exhibit 3]

Furthermore, Entertainers are not allowed to cater to the desires of certain customers and/or maximize their opportunity for profits because the manner in which they perform is limited by Defendant. For example, Defendant forbids Entertainers from wearing "street clothes," such as tennis shoes, sandals, flip-flops, and blue jeans, while working. [James Bradley Nicholson Dep., pg.76, lns. 1-10; Stephen D. Nicholson Dep., pg. 46, ln. 22 – pg. 48, ln. 20] Entertainers are not free to get as many tattoos as they wish. [Stephen D. Nicholson Dep., pg. 17, lns. 17-19] Entertainers can make requests to the DJ about what music she would like the club to play, however, the music selection in the club is controlled by the DJ and the managers. [Stephen D. Nicholson Dep., pg. 45, ln. 20 – pg. 46, ln. 14]

Entertainers are also limited in their opportunity for profit because of Defendant's prohibition of their ability to sub-contract other qualified individuals to perform their duties at Defendant's club. [Defendant's Answer and Affirmative Defenses, Docket Entry No. 14, ¶22]

All of these rules restrict an Entertainer's opportunity for profit and expose the blatant inaccuracies in Defendant's contention that "a particular Entertainer's earning power was not within the control of the Defendant."

Defendant also claims that Entertainers had a significant opportunity for loss due to the payment of a "House Fee," the investment of time, and their investment in costumes. In their Brief, Plaintiffs conceded that an Entertainer's only opportunity for loss comes in the form of a "House Fee" that she is required to pay for each shift, the amount of which ranges from $0.00 -

$30.00.  Plaintiff also noted that, because Entertainers were allowed to defer house fees to a later shift, even this risk is somewhat mitigated.  [James Bradley Nicholson Dep., pg. 24, ln. 20 – pg. 25, ln. 6]  Plaintiff's Brief, pgs. 12-13.  However, the other two opportunities for loss cited by Defendant (investment of time and investment in costumes) are unpersuasive and have been rejected as irrelevant to this factor of the "economic reality" test.

> Although the profit opportunity may depend in part on how good a pickle picker is, there is no corresponding possibility for migrant worker loss.  As the Gillmor court held, a reduction in money earned by the migrants is not a loss sufficient to satisfy the criteria for independent contractor status.  535 F.Supp. at 162.  The migrants have invested nothing except for the cost of their work gloves, and therefore have no investment to lose.  Any reduction in earnings due to a poor pickle crop is a loss of wages, and not of an investment.  Lauritzen I, 624 F.Supp. at 969.

Lauritzen, 835 F.2d at 1536.  See also Harper v. Wilson, 302 F.Supp.2d 873, 878-879 (N.D.Ill. 2004) (rejecting notion that investment of time was relevant to analysis of second factor).

At the end of the day, the undisputed facts of this case demonstrate that Entertainers were unable to exercise any significant managerial skill that could affect their bottom line.  Their opportunity for profit was restricted by Defendant's heavy-handed control over almost every aspect of the enterprise and their opportunity for loss was limited to a maximum of $30.00 per shift.  Because these undisputed facts demonstrate Entertainers' opportunity for profit or loss was not dependant upon their managerial skills, this factor tilts in favor of Plaintiffs.

    iii.    <u>Plaintiffs' investment in equipment or materials required for their task, or their employment of workers.</u>

Despite a wealth of uncontested evidence that Entertainers do not make any capital investment in Defendant's facilities, advertising, maintenance, security, staff, sound system and lights, food, beverage, and other inventory, that Defendant is responsible for maintenance of its facilities, inventory, and obtaining all appropriate business insurance and licensing and bears any

11

liability associated therewith, and that Entertainers are not permitted to sub-contract other qualified individuals to perform their duties [James Bradley Nicholson Dep., pg. 18, ln. 20 – pg. 19, ln. 20; Defendant's Answer and Affirmative Defenses, Docket Entry No. 14, ¶¶21-23; Defendant's Answer to Plaintiffs' Interrogatory No. 9, pgs. 3-4], Defendant refuses to concede that this factor tilts in favor of the Plaintiffs.

Defendant attempts to create a distinction between equipment and materials used exclusively for work and those that can be used for other purposes. Setting aside the fact that there is no evidence in the record to support Defendant's contention that Entertainers cannot utilize their work clothing outside of work, no such distinction has been recognized by the Seventh Circuit and even a cursory review of the case law from within the Circuit should disabuse Defendant of any notion that such a distinction was meritorious.

In Secretary of Labor, U.S. Dept. of Labor v. Lauritzen, 835 F.2d 1529 (7th Cir. 1987), the Court wrote:

> The workers here are responsible only for providing their own gloves. Gloves do not constitute a capital investment. As in Gillmor, '[e]verything else, from farm equipment, land, seed, fertilizer, [and] insecticide to the living quarters of the migrants is supplied by the defendants.' Id. at 162. See Lauritzen I, 624 F.Supp. at 969. Although in Brandel the migrant furnished the pails, the Brandel court minimized this factor by saying that in pickle harvesting by hand there is no need for heavy capital investment by the worker, and the overall size of the investment by the employer relative to that by the worker is irrelevant. 736 F.2d at 1118-19. To the contrary, we believe that the migrant workers' disproportionately small stake in the pickle-farming operation is an indication that their work is not independent of the defendants.

Id at 1537.

> Plaintiff had little investment in equipment or materials, nor did he have the authority to hire workers. Plaintiff's sole investment in equipment consisted of the hand tools he needed for bricklaying. The Company, on the other hand, provided forklifts, scaffolding,

> mixers, trucks, wheelbarrows, spades, mortar, sand, and other
> equipment needed for bricklaying.  Furthermore, only the
> Company's three co-owners had the authority to hire workers.
> Plaintiff had not hired any of the members of his crew.
> Additionally, Plaintiff did not have the authority to fire workers.  If
> a worker failed to report to work, Plaintiff merely informed
> Mendys, who then instructed Lizak on the action he was to take.
> . . .
> Plaintiff therefore satisfies every factor relevant to determining a
> worker's status as an employee under the FLSA.  Consequently,
> this Court rejects Defendants' argument that he was an independent
> contractor.

Lizak v. Great Masonry, Inc., 2009 WL 3065396 at *6, *slip copy* (N.D.Ill. 2009).

> It is undisputed that the announcers made no capital investment in
> the broadcast. All the broadcasting equipment was provided by the
> station.  In contrast, the station currently hires an independent
> contractor announcer who records programs from his home.
> . . .
> The inevitable conclusion from analyzing these six factors is that
> the announcers were Century's employees rather than independent
> contractors.

U.S. E.E.O.C. v. Century Broadcasting Corp., 1990 WL 43286 at *4 (N.D.Ill. 1990).

Based on the foregoing and Reich v. Circle C. Investments, Inc., 998 F.2d 324, 328 (5th Cir. 1993), this Court should conclude that an Entertainer's relatively minimal investment and complete lack of control over Defendant's workforce provides evidence that Entertainers were employees of Defendant.

Finally, although it is highly unlikely the Court needs such a reminder, this is not a Title VII case.  Thus, Defendant's citation to an Eastern District of Wisconsin case discussing the importance of this factor in the context of a Title VII employee/employer analysis is of no moment because the Seventh Circuit has held that the definition of employee is broader under the FLSA than under Title VII.  Knight v. United Farm Bureau Mutual Insurance Company, 950 F.2d 377, 380 (7th Cir. 1991).

    iv.  <u>Whether the service rendered requires a special skill.</u>

  Despite the testimony of its own manager that there is no skill required to be an Entertainer, Defendant has elected to take a contrary position.  Apparently, Defendant believes the Court should either ignore their manager's testimony or it is Defendant's position that their own manager testified falsely.  Neither position can prevent Plaintiffs from obtaining summary judgment.  See <u>Piscione v. Ernst & Young, L.L.P.</u>, 171 F.3d 527, 532 (7th Cir. 1999) (noting that parties could not create a material issue of fact by manufacturing a conflict with their own testimony).

  When Plaintiffs state that Defendant's own manager testified that there is no skill required to be an Entertainer, they mean it.

> Q. Are there any particular skills that the entertainer has to have?
>
> A. None.

[Stephen D. Nicholson Dep., pg 13, lns. 5-7]  James Nicholson's answer was similar, albeit less pointed.

> Q. Give me an idea from your perspective what types of skills or attributes you look for in terms of a potential entertainer who would perform at MER Corp.
>
> A. As far as their skills on stage, I don't look for any. . . . Basically it's a gut instinct. . . .

[James Bradley Nicholson Dep., pg. 36, ln. 16 – pg. 37, ln. 12]

  Defendant's application process further denigrates Defendant's position.  According to Defendant's management, an Entertainer must go to the Defendant, complete an "Audition Application," provide sufficient identification, and complete an audition which consists of dancing for two or three songs in order to obtain employment with Defendant.  [James Bradley

14

Nicholson Dep., pg. 29, ln. 12 – pg. 30, ln. 23; pg 31, ln. 9 – pg. 33, ln. 22; James Bradley Nicholson Dep., Exhibit 1]  Absent from that self-described application process is any suggestion that Defendant conducts interviews or otherwise assesses the communication skills possessed by a prospective Entertainer, a fact that further undermines Defendant's dubious position.

      v.      The degree of permanency and duration of the working relationship.

Defendant's argument on this factor relies heavily on a claim that Entertainers were free to work at other adult entertainment establishments while working for Defendant.  The undisputed facts do not support, and in fact contradict, this position.

In their Brief, Plaintiffs set forth the fact that Stephen D. Nicholson, one of Defendant's managers, informed Entertainers that they were not permitted to dance at other night clubs. [Wendi Morse Dep., pg. 76, lns. 9-21; Stephen D. Nicholson Dep., pg 5, lns. 6-11]  This fact was not disputed by Defendant. See Plaintiffs' Brief, pg. 4 and Defendant's Brief, pg. 9, fn. 1. However, Defendant argues otherwise in their Brief and cites to the Deposition of Angela Avalos to support its argument.  Defendant's Brief, pg. 23.  However, the cited portion of Ms. Avalos' deposition merely reads as follows:

> Q.    Okay.  Now, as you knew this industry, was it common for Dancer's (sic) to go from one club to another?
>
> A.    Yes.
>
> Q.    That happened pretty frequently, fair to say?
>
> A.    Yes, I kept to myself, but, yes.

[Angela Avalos Dep., pg. 42, lns. 13-17]  Nothing in this testimony supports Defendant's contention that Entertainers were free to work at other adult entertainment establishments while working for Defendant.

The mere fact that persons who work in an industry often work for other employers in that same industry is no more probative than the fact that certain job classifications experience a high rate of turnover and/or short tenures.  A cashier does not lose the protections of the FLSA by leaving Walmart after a brief stint to work for Target after previously having worked for Meijer and Costco.

      vi.      <u>The extent to which the service rendered is an integral part of Defendant's business.</u>

The inanity of Defendant's position can be summed up by its argument on this factor.  Defendant has represented to this Court, apparently without shame or embarrassment, that Entertainers are not an integral part of its business.  In other words, it would have this Court believe that dancers are not integral to a club doing business as Dancers Showclub and that adult entertainment is not an integral part of an adult entertainment establishment.

Defendant's efforts to justify this position are equally unbelievable.  First, Defendant claims that the majority of its profits come from alcohol sales and its "cover charge" whereas no more than 10% of its profits come from the Entertainers.  Of course, Defendant chooses to ignore the testimony of its own management who noted that Defendant is dependent upon Entertainers in order to conduct its business according to its present business model.  [Stephen D. Nicholson Dep., pg. 9, ln. 13 – pg. 10, ln. 6; James Bradley Nicholson Dep., pg. 27, ln. 25 – pg. 28, ln. 6] Additionally, one of those same managers stated that customers of Defendant rarely visit the club for the exclusive purpose of obtaining food and drink.  [James Bradley Nicholson Dep., pg. 27, lns. 16-20]  Defendant neither disputes these facts which are set forth in page 5 of Plaintiffs' Brief nor explains how those facts comport with its novel argument that no more than 10% of its profits are attributable to the presence of Entertainers.

Second, Defendant attempts to distinguish the infallible conclusion of the Court in Harrell v. Diamond A Entertainment, Inc., 992 F.Supp. 1343 (M.D.Fla. 1997), that "[e]xotic dancers are obviously essential to the success of a topless nightclub." Defendant's contention is that Entertainers are not integral to its business because it could operate and attempt to remain in business as something other than an adult entertainment establishment. This argument lacks any import.

As much as Defendant may wish to change them, the facts of this case are that Defendant operates an adult entertainment establishment and the Entertainers are the centerpiece of that business [FN3]. Plaintiffs sought employment with Defendant as Entertainers and worked for Defendant as Entertainers. Plaintiffs' lawsuit is based on the manner in which they were compensated while working for Defendant as Entertainers. The issue the Court must decide when analyzing the sixth factor is whether Entertainers are integral to an adult entertainment establishment. As the Harrell Court noted, that answer is obvious.

## V. CONCLUSION

Based on the foregoing as well as their Motion for Summary Judgment, Plaintiffs respectfully request that summary judgment be denied to Defendant and instead granted in their favor and that the Court convert the current trial setting beginning on August 23, 2010 to a hearing to determine the damages to which Plaintiffs are entitled as a result of Defendant's unlawful actions.

---

[FN3] When asked what would happen to the Defendant's business if it eliminated Entertainers, James Bradley Nicholson, the individual who oversees Defendant's operations, responded: "The same thing if McDonald's got rid of hamburgers, all right? We wouldn't be that business." [James Bradley Nicholson Dep., pg. 27, ln. 25 – pg. 28, ln. 1; pg. 5, ln. 3 – pg. 6, ln. 8].

        Respectfully submitted,

        /s/ Andrew G. Jones
        Andrew G. Jones
        Philip J. Gibbons, Jr.
        Rebecca L. Brettin
        GIBBONS JONES, P.C.
        Two Meridian Plaza
        10401 N. Meridian St., Ste. 130
        Indianapolis, Indiana 46290
        Telephone:  (317) 706-1100
        Facsimile:  (317) 616-3337
        E-mail:  ajones@gibbonsjones.com
        pgibbons@gibbonsjones.com
        rbrettin@gibbonsjones.com

        Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was been served on the 5th day of March, 2010, by way of the Court's Electronic Case Filing system upon the following counsel of record:

Richard Kammen
Dorothy Hertzel
GILROY & KAMMEN
Richard@kammenlaw.com
dorie@kammenlaw.com

        /s/ Andrew G. Jones